IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALM VENTURES LLC, dba PINEAPPLE HILL SALOON & GRILL,**<br><br>**Plaintiff,**<br><br>v.<br><br>**GAVIN NEWSOM, XAVIER BECERRA, and ERICA PAN, in their official capacities,**<br><br>**Defendants**. | 2:20-cv-11501<br><br>**[PROPOSED] STATEMENT OF DECISION DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:      The Honorable John F. Walter<br><br>Action Filed: 12/20/2020 |

## INTRODUCTION

Plaintiff runs a restaurant in Southern California and challenges the State's current COVID-19-related regulations on restaurants.  Currently, with the exception of six counties, all counties within California are in the first tier (purple tier) under the State's Blueprint for a Safer Economy (Blueprint).[1]  In this tier, restaurants can offer takeout, delivery, and outdoor dining, but not indoor dining.

---

[1] As of February 22, 2021, Alpine, Sierra, and Trinity Counties were in tier 3 and Del Norte, Plumas, and Mariposa Counties were in tier 2. https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID19CountyMonitoringOverview.aspx.

Several of Plaintiff's arguments rest on alleged violations of state law. Federal courts are barred from adjudicating those claims by California's sovereign immunity under *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), and Plaintiff does not contest this point in its reply brief.  As to Plaintiff's other claims, Plaintiff has not identified any fundamental right or suspect classification implicated by the Blueprint, making the remaining claims subject to rational-basis review, which the Court finds are not likely to succeed.  Under this standard, the Court may not weigh the parties' scientific evidence and attempt to decide whose evidence is more persuasive, but rather determines whether the Blueprint is "rationally related to a legitimate governmental interest." *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001).  Fighting a deadly pandemic is plainly a legitimate governmental interest. The rationale articulated within the Blueprint and related orders themselves—bolstered by Defendants' scientific evidence and common sense—compels the result that the challenged orders are rationally related to this goal and, thus, lawful.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   COVID-19 HAS KILLED ABOUT HALF A MILLION AMERICANS.

The COVID-19 pandemic has now infected more than 104 million people worldwide and killed over 2.27 million people.[2]  In the United States, the virus has infected about 28 million people and killed about half a million Americans.[3]  More than 3.4 million Californians have been diagnosed with COVID-19, and about 50,000 have died from the disease.[4]

---

[2] *See* World Health Organization, WHO Coronavirus Disease (COVID-19) Dashboard, available at https://covid19.who.int/table (last visited February 5, 2021).

[3] Centers for Disease Control and Prevention, COVID Data tracker, available at https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited February 22, 2021).

[4] State of California, Tracking COVID-19 in California, State Dashboard, available at https://covid19.ca.gov/state-dashboard/ (last visited February 22, 2021).

The novel SARS-CoV2 coronavirus that causes COVID-19 is easily transmissible.  (*See* Rutherford Decl. ¶¶ 27-32, ECF No. 22-1; Watt Decl. ¶¶ 24-32, ECF No. 22-2.)  It spreads through respiratory droplets that remain in the air and may be transmitted unwittingly by individuals who exhibit no symptoms.  (*Id*.) There is currently no known cure and no widely effective treatment.  (Rutherford Decl. ¶ 47.)  While vaccines are being distributed, supply is limited, and doses will not be universally available for many months.  Consequently, measures that limit physical contact, such as restrictions on places where people gather and physical distancing, are the only widely-recognized, effective ways to slow the spread.  (*Id.* ¶ 112; Watt Decl. ¶ 99)  In December and January, California's COVID-19 numbers spiked and overwhelmed hospitals throughout the state.[5]

ICUs across the state have been pushed to their limits,[6] straining staff and resources,[7] and threatening the lives of individuals who need urgent and life-saving medical care—whether for COVID-19 or for other serious illnesses such as heart attacks, strokes, and cancer treatments.

---

[5] In Los Angeles County, doctors across four hospitals have already been briefed on how to allocate resources in such a crisis.  Rong-Gong Lin II, et al., *L.A. County Outlines Wrenching Moves to Ration Health Care if COVID-19 Hospital Crisis Worsens*, L.A. Times (Dec. 19, 2020), available at https://www.latimes.com/california/story/2020-12-19/los-angeles-county-coronavirus-hospitalization-surge-rationing (last visited February 5, 2020).

[6] Faith E. Pinho, et. al., *Hospital ICUs Full in Silicon Valley, Central Valley, as California Braces for More*, L.A. Times (Dec. 9, 2020), available at https://www.latimes.com/california/story/2020-12-09/covid-hospitals-full (last visited Dec. 14, 2020).

[7] Rong-Gong Lin II, et al., *Hospitals Face Tough Choices as ICUs Fill Up With COVID-19 Patients*, L.A. Times (Dec. 8, 2020), available at https://www.latimes.com/california/story/2020-12-08/california-icu-beds-fill-up-coronavirus-cases (last visited Dec. 14, 2020); Blake Farmer, *As Hospitals Fill With COVID-19 Patients, Medical Reinforcements are Hard to Find*, NPR (Nov. 30, 2020), available at https://www.npr.org/sections/health-shots/2020/11/30/938425863/as-hospitals-fill-with-covid-19-patients-medical-reinforcements-are-hard-to-find (last visited Dec. 14, 2020).

1  **II.    THE BLUEPRINT FOR A SAFER ECONOMY**

2          Currently, the State is operating under the Blueprint for a Safer Economy.

3  The Blueprint permits "[l]ower risk activities or sectors" to reopen and expand

4  operations before "higher risk activities or sectors."[8]  The risk level of activities is

5  determined based on criteria identified in the Blueprint, such as the ability to

6  accommodate face coverings and ensure physical distancing, to limit duration of

7  exposure, to optimize ventilation, and to limit the amount of mixing of people from

8  differing households and communities.  *Id.*  In addition, the Blueprint divides

9  counties into four tiers "based on risk of community disease transmission" tied to

10 case rates, or how prevalent COVID-19 is in the community.  *Id.*

11         Under this reopening system, counties in tier 1/purple/widespread (the highest

12 level of risk) may allow restaurants to operate take-out and outdoor dining.  Under

13 tier 2, restaurants can operate indoors at 25% capacity or 100 people, whichever is

14 fewer.  In tier 3, restaurants can operate indoors at 50% capacity or 200 people,

15 whichever is fewer.  In tier 4, restaurants can operate indoors at 50% capacity.

16                                **LEGAL STANDARD**

17         A preliminary injunction is "an extraordinary remedy that may only be

18 awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v.*

19 *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Plaintiff must establish:

20 "(1) a likelihood of success on the merits, (2) that the plaintiff[s] will likely suffer

21 irreparable harm in the absence of preliminary relief, (3) that the balance of equities

22 tips in [their] favor, and (4) that the public interest favors an injunction."  *Wells*

23 *Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014),

24 *as amended* (Mar. 11, 2014) (citing *Winter*, 555 U.S. at 20).  A preliminary

25 injunction may also issue under the "serious questions" test.  *Alliance for the Wild*

26 *Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the viability of

27 _____

28         [8] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID19CountyMonitoringOverview.aspx.

4

1   this doctrine post-*Winter*).  Under this test, plaintiffs must demonstrate "that serious

2   questions going to the merits were raised and the balance of hardships tips sharply

3   in the plaintiff's favor," in addition to the other *Winter* elements.  *Id.* at 1134–35

4   (citation omitted).  Because it seeks a mandatory injunction to disrupt already-

5   implemented COVID-19-related directives, Plaintiff must meet the "doubly

6   demanding" burden of "establish[ing] that the law and facts clearly favor [their]

7   position." *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

8                                       **DISCUSSION**

9   **I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.**

10      Plaintiff has failed to show a likelihood of success on the merits of any of its

11  claims.

12          **A.    The Substantive Due Process Claim**

13                  **1.    Rational Basis Review Applies.**

14      The business regulations at issue do not implicate "fundamental"

15  constitutional rights that trigger heightened judicial scrutiny.

16  "Substantive due process cases typically apply strict scrutiny in the case of a

17  fundamental right and rational basis review in all other cases." *Witt v. Dep't of Air*

18  *Force*, 527 F.3d 806, 817 (9th Cir. 2008).  These fundamental rights must be

19  "objectively, deeply rooted in this Nation's history and tradition and implicit in the

20  concept of ordered liberty, such that neither liberty nor justice would exist if they

21  were sacrificed. . . . Our Nation's history, legal traditions, and practices thus

22  provide the crucial guideposts for responsible decisionmaking that direct and

23  restrain our exposition of the Due Process Clause." *Washington v. Glucksberg*, 521

24  U.S. 702, 720–21 (1997) (quotations and citations omitted).  "Substantive due

25  process has, therefore, been largely confined to protecting fundamental liberty

26  interests, such as marriage, procreation, contraception, family relationships, child

27  rearing, education and a person's bodily integrity . . . ." *Franceschi v. Yee*, 887

28  F.3d 927, 937 (9th Cir. 2018).

1      Although there is a "generalized due process right to choose one's field of

2  private employment," subject to reasonable regulations, cases recognizing this

3  generalized right "all deal with a complete prohibition of the right to engage in a

4  calling," rather than a brief interruption in a party's ability to work.  *Conn v.*

5  *Gabbert*, 526 U.S. 286, 292 (1999); *see also Guzman v. Shewry*, 552 F.3d 941, 954

6  (9th Cir. 2009).  Any such right to work, moreover, has never been held to be

7  "fundamental," so "the judicial review which applies to laws infringing on

8  nonfundamental rights [is] a very narrow one" and is satisfied if the Government

9  "*could* have had a legitimate reason for acting as it did."  *Sagana v. Tenorio*, 384

10  F.3d 731, 743 (9th Cir. 2004), as amended (Oct. 18, 2004) (citation omitted)

11  (emphasis original); *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997 (9th

12  Cir. 2007), *aff'd sub nom. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008)

13  (challenged rule must be "arbitrary and lacking a rational basis").

14              **2.     The Restrictions Satisfy Rational Basis Review.**

15      Under rational basis review, the Court considers whether the Blueprint is

16  "rationally related to a legitimate governmental interest."  *Ball v. Massanari*, 254

17  F.3d 817, 823 (9th Cir. 2001).  "Under rational-basis review, '[t]he burden falls on

18  the party seeking to disprove the rationality of the relationship between the

19  classification and the purpose.'"  *United States v. Navarro*, 800 F.3d 1104, 1113

20  (9th Cir. 2015).  "[A] classification is valid 'if there is any reasonably conceivable

21  state of facts that could provide a rational basis for the classification.'"  *Id.* (quoting

22  *FCC v. Beach Commc'ns, Inc.* 508 U.S. 307, 313 (1993).)  "This inquiry is not a

23  'license for courts to judge the wisdom, fairness, or logic of legislative choices'; if

24  we find a 'plausible reason[] for [California's] action, our inquiry is at an end."

25  *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016) (quoting

26  *Beach Commc'ns, Inc.*, 508 U.S. at 313-14.)

27      COVID-19 has killed nearly half a million Americans.  Clearly, California has

28  a legitimate interest in attempting to slow this horrific death toll.

The reasons for California's actions are more than plausible: they are based on scientific evidence.  The State's Orders and other judicially noticeable documents explicitly lay out a rationale for the Blueprint that is plainly related to the compelling state interest in curbing the spread of a deadly disease.  The Blueprint imposes restrictions on sectors and activities based on an assessment of the transmission risk that they pose, as well as the extent to which COVID-19 has spread in the community.[9]  The State's restrictions are designed to reduce the spread of the disease based on the relative prevalence of these factors in different settings and modes of operation.

Moreover, Defendants have demonstrated that California's actions, and the specific restrictions on restaurants and salons, are based on widely accepted scientific evidence.  The Blueprint distinguishes between different activities and business sectors and imposes restrictions based upon the relative risk they pose of spreading COVID-19.  (Rutherford Decl. ¶¶ 60-72; Watt Decl. ¶¶ 72-78.)  Businesses that pose a lower risk are permitted to open earlier or with fewer restrictions in counties with high transmission rates, while businesses that pose a greater risk are required to close or face greater restrictions.  (Id.)  The Blueprint's distinctions are based on factors currently understood by the scientific community to increase the risk of transmission, such as the possibility of mask wearing, the feasibility of physical distancing, whether the activity is indoor or outdoor, and the amount of time individuals spend at the business.  (Id.)

It is uncontradicted that indoor gatherings are more dangerous than outdoor gatherings (Watt Decl. ¶ 43), which justifies the State's decision to restrict indoor activities, such as indoor dining, in counties hard-hit by COVID-19.  Indoor

_____

[9] Office of the Governor, *Governor Newsom Unveils Blueprint for a Safer Economy, a Statewide, Stringent and Slow Plan for Living with COVID-19*, https://www.gov.ca.gov/2020/08/28/governor-newsom-unveils-blueprint-for-a-safer-economy-a-statewide-stringent-and-slow-plan-for-living-with-covid-19/ (last visited Feb. 8, 2021); *Blueprint for a Safer Economy (Activity and Business Tiers)*, https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Dimmer-Framework-September_2020.pdf (last visited Feb. 8, 2020).

gatherings pose a substantial risk to patrons and workers alike.  For restaurants, the risk is heightened by the fact that eating and drinking require the removal of masks, making transmission more likely. (*Id.* ¶ 45; (Rutherford Decl. ¶ 88.)  Additionally, restaurant patrons often drink alcohol with their meals, making them less likely to observe social-distancing protocols.  (Watt Decl. ¶ 69.)

Plaintiff argues that it is unable to carry on a trade, which is not true.  Plaintiff can still operate a restaurant.  It just cannot temporarily host diners indoors.

Plaintiff also argues that a film crew was permitted to eat together outdoors near the Pineapple Hill Saloon back when the Saloon was not permitted to offer outdoor dining.  (Pls.' Br. at 22, ECF No. 18.)  The argument is not persuasive because under rational basis review, a State may move incrementally and focus on one particular problem more so than others.  *Cf. Beach Commc'ns, Inc.*, 508 U.S. at 316.  And, as another federal court recognized, the difference in treatment between film and television sets on the one hand, and restaurants, bars, hair salons, and nail salons on the other, has a "conceivable basis."  *Disbar Corp. v. Newsom*, No. 2:20-CV-02473-TLN-DB, 2020 WL 7624950, at *5 (E.D. Cal. Dec. 22, 2020); (Rutherford Decl. at ¶ 111).  Regardless, restaurants and film crews alike can now both conduct outdoor dining, meaning that Plaintiff's anecdote is irrelevant for the purposes of this motion.  Finally, as discussed *infra* with respect to the Equal Protection claim, the current safety precautions in the film industry are much more rigorous than those imposed on Plaintiff's business.

Plaintiff has failed to make the threshold showing of disproving all plausible explanations for the restrictions on restaurants, and Defendants have affirmatively provided evidence that supports the actions taken and distinctions drawn.

**B.   There Is No Improper Delegation.**

Plaintiff cites a collection of mainly *Lochner*-era cases for the proposition that this Court has the power to decide whether California's government officials have improperly delegated rule-making authority to other California government

1    officials.  The Court declines the invitation to micromanage how State officials

2    share power among themselves.  This is fundamentally a question of State law, and

3    Defendants—who were all sued in their official capacities, making this lawsuit

4    effectively one against the government of California—enjoy sovereign immunity

5    from lawsuits based on California law.  *Pennhurst State Sch. & Hosp. v.*

6    *Halderman*, 465 U.S. 89, 106 (1984).  Furthermore, the cases that Plaintiff cites are

7    all readily distinguishable from this one.  And even if the Court were to apply the

8    federal non-delegation standard to these state laws, it would find that the California

9    legislature has not improperly delegated its police power by not laying out an

10   intelligible principle. *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

11          The California Legislature established the intelligible principle that underpins

12   the Emergency Services Act, which is to "mitigate the effects of natural, manmade,

13   or war-caused emergencies that result in conditions of disaster or in extreme peril to

14   life, property, and the resources of the state," and to "protect the health and safety

15   and preserve the lives and property of the people of the state." Cal. Gov't Code, §

16   8550.  The ESA gives the Governor the authority to "make, amend, and rescind

17   orders and regulations necessary" to overcome a state of emergency.  *Id.* § 8567(a).

18   The Legislature thus laid out the intelligible principle that the State must take

19   vigorous measures to combat deadly epidemics, such as COVID-19.

20          For similar reasons, the communicable disease prevention provisions of the

21   California Health and Safety Code are also not an unlawful delegation.  As one

22   example, the Health and Safety Code allows State officials to take steps deemed

23   "necessary to . . .  prevent [the] spread" of communicable diseases, Cal. Health &

24   Safety Code, § 120140.  The statutory grant of authority makes it plain that the

25   Legislature has decided the "intelligible principle" of the statute, which is

26   protecting public health from communicable diseases.

27          Plaintiff's argument that Governor Newsom cannot delegate his powers under

28   the ESA to an "unelected bureaucrat, (Pls.' Br. at 15) is unavailing.  The Court has

1  no power to control how the Governor shares responsibilities with other high-level

2  executive officials. *Cf. Marbury v. Madison*, 5 U.S. 137, 170 (1803) ("The

3  province of the court is, solely, to decide on the rights of individuals, not to enquire

4  how the executive, or executive officers, perform duties in which they have a

5  discretion.").

6  **C.   Procedural Due Process—No Hearing Was Required.**

7  Plaintiff argues that the orders violate their federal due process rights because

8  the Blueprint and associated orders "provide for no opportunity for a hearing, no

9  appeal, and no reconsideration." (*See* Pls.' Br. at 17.)  But for State orders that are

10  legislative in nature, rather than adjudicative in nature, there is no right to an

11  individualized hearing.  Due process requires only that the order be published to the

12  public.  *Halverson v. Skagit Cty.*, 42 F.3d 1257, 1260–61 (9th Cir. 1994)*, as*

13  *amended on denial of reh'g* (Feb. 9, 1995).  In this case, there is no question that

14  the orders that Plaintiff challenges "affect large areas and are not directed at one or

15  a few individuals." *Id.*  They apply statewide to a vast number of businesses and

16  individuals.  The State is not required to conduct thousands of individualized

17  hearings whenever it issues a regulation that affects the operations of the State's

18  businesses.  The challenged orders do not violate any procedural due process rights.

19  **D.   The Equal Protection Claim Fails.**

20  **1.   Rational Basis Review Applies.**

21  For an equal protection challenge, "[w]hen no suspect class is involved and no

22  fundamental right is burdened, [courts] apply a rational basis test to determine the

23  legitimacy of the classifications." *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277–78

24  (9th Cir. 2004) (citations and quotations omitted).  Rational basis applies in this

25  case because the challenged orders do not burden a "fundamental right," as

26  discussed regarding the Substantive Due Process claim.  And owners of restaurants

27  and are not a "suspect class."

28

2.    **The Challenged Orders Have a Rational Basis.**

It appears Plaintiff is contending that their equal protection rights were violated because other industries have allegedly been given preferential treatment.

As a threshold matter, Plaintiff's claim fails because an equal protection claim requires only that "similarly circumstanced" persons be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). As discussed with respect to the Substantive Due Process claim, since the lifting of the Regional Stay at Home Order, restaurants can once more offer outdoor dining. The burden is on Plaintiff show that its equal protection rights are currently being violated, and they have failed to identify differences in treatment currently in effect under the Blueprint.

Furthermore, Plaintiff's complaints about other industries do not contradict Defendants' substantial evidence of the risk posed by indoor dining. For example, Plaintiff's complaints about "Hollywood" ignore the fact that the film industry and Plaintiff operate under completely different circumstances and are thus not similarly situated. As discussed above, another federal district court recently noted the differences between the settings. *Disbar Corp. v. Newsom*, No. 2:20-CV-02473-TLN-DB, 2020 WL 7624950, at *5 (E.D. Cal. Dec. 22, 2020). These differences in circumstances provide a plausible basis for any difference in treatment. Plaintiff offers its services to a series of strangers who come and go without any COVID-19 testing or need to show a recent negative test. (Rutherford Decl. ¶ 111). In contrast, film casts and crews tend to work together on a particular project for an extended period of time, (*Id.*), and the industry is subject to health and safety requirements that further mitigate risk of transmission among crews and in the broader community. [10]

---

[10] https://www.dga.org/-/media/Files/TheGuild/Coronavirus-Resources/ReturnToWork_FullAgreement.ashx; DGA [Directors Guild of America] Summary of Industry-Wide COVID-19 Return to Work Agreement, available at https://www.dga.org/dga/CoronavirusUpdates/COVID-19_RTW_Agreement_Summary.pdf.

1

2

**E.    The Freedom of Assembly Claim Fails.**

       **1.    The Proper Standard Is Rational Basis.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

      The Supreme Court's case law on freedom of association has essentially subsumed the Freedom of Assembly Clause. *Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1140 (D.N.M. 2020).  In freedom of association cases, the general rule is that "[u]nless laws create suspect classifications or impinge upon constitutionally protected rights, it need only be shown that they bear some rational relationship to a legitimate state purpose." *City of Dallas v. Stanglin*, 490 U.S. 19, 23 (1989) (citation and quotation omitted).  Moreover, "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), overruled on other grounds by *Bd. of Tr. Of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc).  Plaintiff has not provided any evidence that meets this threshold requirement: the alleged harm is to its business operation and is pecuniary in nature.

18

19

20

21

22

23

24

25

26

27

28

      Even so, the Blueprint plainly does not implicate any protected free assembly or associational right of Plaintiff.  The Supreme Court has explained that heightened scrutiny applies to "choices to enter into and maintain certain intimate human relationships." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984).  It also applies to the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618.  Heightened scrutiny is applied for only certain intimate human relationships not at issue in this case. *U.S. Jaycees*, 468 U.S. at 619–20.  Plaintiff's interactions with their patrons are not remotely comparable to the "intimate human relationships" *U.S. Jaycees* was describing.

Serving a customer a sandwich is not analogous to marriage, childbirth, or the raising of children.

Nor do Plaintiff and their customers "associate for the purpose of engaging in those activities protected by the First Amendment." Even if Plaintiff and their customers happened to engage in some incidental political speech, that would not trigger heightened constitutional scrutiny. *Cf. City of Dallas*, 490 U.S. at 24-25. The fact that some customers of Plaintiff's might choose to meet a friend or family member for a restaurant meal does not mean that Plaintiff's ordinary commercial activities are protected by the First Amendment.

### 2.    The Challenged Orders Satisfy Rational Basis.

As already discussed, the challenged orders satisfy the permissive rational basis standard. Furthermore, customers are currently able to "assemble" at restaurants because they can go to restaurants together and eat outdoors.

Plaintiff's argument that California is the only state that prohibits indoor dining is irrelevant. Rational basis does not require California to copy what other States have done.

## II.    PLAINTIFF FAILS TO SHOW A LIKELIHOOD OF IRREPARABLE HARM.

A plaintiff seeking temporary injunctive relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis in original). A plaintiff cannot obtain temporary injunctive relief without producing *evidence* to make this showing. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (vacating preliminary injunction because movant had adduced no evidence of irreparable harm). Such evidence must be more than "affidavits [that] are conclusory and without sufficient support in facts." *Id.*

Plaintiff's business-owner declarations appear to have been drafted before

1   January 25, 2021, when the State lifted the Regional Stay at Home Order.  The

2   declarations assert, in conclusory fashion that this Court need not accept, that it is

3   unable to run its businesses at all, which is currently not true because restaurants

4   can sell take-out and offer outdoor dining.  Plaintiff's evidence—which discusses

5   conditions that existed before the lifting of the Regional Stay at Home Order—does

6   not establish any irreparable harm under current conditions.  In contrast, the harm

7   that Defendants are seeking to prevent—mass death—is the quintessential

8   irreparable harm.

9   **III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR**

10        **DEFENDANTS.**

11        If Plaintiff's motion were granted, the harm to the general public would be

12   incalculable, especially during this critical time when the State's directives must be

13   followed to combat the pandemic.  The public interest and the balance of the

14   equities thus strongly favor the State Defendants' important public health interests

15   in combating COVID-19.[11]

16        The public has a strong interest in protecting itself from infectious disease and

17   in curbing COVID-19 to prevent illness and death—not only from the disease itself,

18   but also from the effects of overwhelming the State's hospital system.  Most

19   significantly, a preliminary injunction would directly compromise public safety by

20   preventing the State from addressing the worst public health crisis in over a

21   century.  The public interest would be directly harmed if the State were unable to

22   enact temporary restrictions tailored to fit regional needs and stave off the very real

23   possibility of hospitals needing to move to triage-style care.  Slowing and

24   preventing infections is also in the public interest because it will increase the speed

25   in which the economy, schools, and other activities can reopen.

26

27        [11] The public interest and the balance of the equities merge when the
     government is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th
28   Cir. 2014).

1    Any limited and temporary harm Plaintiffs might suffer from the challenged

2    orders is far outweighed by the potential harm to the public health in general should

3    the orders be abruptly lifted.  The orders do not prevent Plaintiff from operating

4    altogether: it may still offer take-out, delivery, and outdoor dining.  Therefore, the

5    public interest in keeping the State's directives and the orderly process of the

6    gradual reopening of the California economy in place greatly outweighs any harm

7    caused to Plaintiff, who seeks to depart from the status quo.

8                                             **CONCLUSION**

9    For all these reasons, the Court denies Plaintiff's motion for preliminary

10   injunction.

11   IT IS SO ORDERED.

12

13   Dated: _____

14                                                        _____
                                                          HON JOHN F. WALTER
                                                          District Court Judge

15   SA2020305182
     42569342.docx

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:   **Calm Venture LLC dba**           No.     **2:20-cv-11501**
             **Pineapple Hill Saloon & Grill v.**
             **Gavin Newsom**

I hereby certify that on <u>February 24, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### [PROPOSED] STATEMENT OF DECISION DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 24, 2021</u>, at San Francisco, California.

L. Santos                                     */s/ L. Santos*
Declarant                                      Signature

SA2020305182
42569344.docx